*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PINNACLE NORTH, LLC,

        Plaintiff-Appellee,

v

KEITH A. WHITE,

        Defendant-Appellant.

UNPUBLISHED
March 24, 2026
11:46 AM

No. 370640
Oakland Circuit Court
LC No. 2020-183261-CB

Before PATEL, P.J., and SWARTZLE and MARIANI, JJ.

PER CURIAM.

Defendant Keith White appeals by right the trial court's opinion and order granting plaintiff Pinnacle North, LLC's motion for settlement of attorney fees. The attorney fees stem from efforts by plaintiff to recover for the breach of a commercial real estate lease between plaintiff and defendant's company, Marketplace Home Mortgage, LLC (MHM). On appeal, defendant also challenges the trial court's earlier rulings that concluded plaintiff could hold defendant personally liable under an alter-ego theory for the liability of MHM, and that a payment of $50,000 to defendant from MHM amounted to a voidable transfer under the Uniform Voidable Transfers Act (UVTA), MCL 566.31 *et seq*. Finding no errors warranting reversal, we affirm.

## I. BACKGROUND

Plaintiff is a limited-liability company that owns the leased real property at issue, which is commonly known as the Pinnacle North Office Center. Defendant is the sole member and president of MHM, a limited-liability company which was no longer in operation at the time of this litigation.[1] When it was an active business entity, MHM had been engaged in the business of soliciting mortgage loans in several states, including Michigan. In April 2018, plaintiff and MHM entered into a three-year commercial lease in which MHM agreed to lease space in the Pinnacle

---

[1] There had previously been another member of MHM who held a 1% interest in the company, but at all times defendant was the sole decisionmaker for the company.

North Office Center. During the summer months of 2018, however, MHM defaulted on its payment obligations under the lease.

In the fall of 2018, MHM entered into negotiations to sell its assets to a third party, New American Funding (NAF). The agreement between NAF and MHM closed on December 31, 2018. By that time, MHM was insolvent. As part of the sale, NAF assumed certain of MHM's liabilities, but the lease between plaintiff and MHM was not among them.[2] When plaintiff contacted MHM about overdue rent in January 2019, MHM informed plaintiff of the sale, including that it did not include plaintiff's lease and that MHM was no longer in operation and had no revenue or employees. In December 2019, defendant wrote himself a check from MHM for $50,000. According to defendant, this was a partial reimbursement for the significant financial contributions he had previously made to MHM. Plaintiff subsequently filed suit against MHM to recover for its breach of the lease. When MHM failed to appear, plaintiff secured a default judgment against it "in the amount of $52,548.24, plus interest, costs, and attorney fees from the date of th[e] judgment going forward."

After plaintiff was unsuccessful in collecting the default judgment from MHM, it filed the instant lawsuit against defendant in his individual capacity, seeking (1) to pierce MHM's corporate veil and hold defendant personally liable for the default judgment, (2) to challenge the $50,000 payment to defendant as an impermissible transfer under the UVTA, and (3) to recover interest, costs, and attorney fees.[3] Following a two-day bench trial, the trial court entered judgment in favor of plaintiff.[4] The court concluded that the $50,000 payment was a voidable transfer under the UVTA, that plaintiff had shown MHM's corporate veil should be pierced, and that defendant was "liable for the entire amount of the default judgment against MHM, plus costs, attorney fees, and interest." The trial court also set forth a process to determine the amount of plaintiff's fee award. Consistent with that process, the court received submissions from the parties and heard argument on the fee request. The court then entered an order awarding plaintiff approximately $92,000 in attorney fees, which comprised fees plaintiff incurred in both the instant lawsuit and the prior one against MHM.

This appeal followed.

## II. APPLICABLE LAW

As a preliminary matter, defendant contends that it is Minnesota law, rather than Michigan law, that should govern this dispute. We disagree.

---

[2] Defendant also became an employee of NAF but, "after less than a year," he and NAF "parted ways."

[3] Plaintiff also brought claims against NAF, but NAF was subsequently dismissed from the lawsuit via stipulated order and is not involved in this appeal.

[4] The trial court initially issued its judgment, along with findings of fact and conclusions of law, on March 27, 2023. After both parties moved to amend the judgment, the court issued an amended judgment, with additional findings of fact and conclusions of law, on June 13, 2023.

As noted by plaintiff, MCR 2.112(J) requires a party who intends to rely on the law of another state to "give notice of that intention either in his or her pleadings or in a written notice served by the close of discovery." Defendant, however, admittedly did not raise the potential application of Minnesota law until after the trial in this case had concluded. Defendant has not attempted to square this timing with MCR 2.112(J)'s requirements, nor has he offered any colorable basis for overlooking his noncompliance with those requirements here. Cf. *Zantop Int'l Airlines, Inc v Eastern Airlines*, 200 Mich App 344, 352; 503 NW2d 915 (1993) (overlooking the plaintiff's failure to provide formal notice of the application of Florida law when the defendant drafted the contract providing that Florida law governed the transaction at issue and "and even argued Florida law in its motion for summary disposition").

Furthermore, in *Sutherland v Kennington Truck Serv, Ltd*, 454 Mich 274, 286; 562 NW2d 466 (1997), our Supreme Court instructed that we are to apply Michigan law unless a rational reason to apply the law of a foreign jurisdiction exists. To determine this, the first question is whether a foreign state has an interest in its law being applied. *Id*. If not, the party seeking to apply the law of a foreign state cannot overcome the presumption that Michigan law applies. *Id*. If a foreign state does have such an interest, then we must determine if Michigan's own interests nonetheless mandate that Michigan law be applied. *Id.* Here, the only apparent connection that Minnesota has to this litigation is that MHM was organized under Minnesota law and had its resident agent registered in Minnesota. But the mere fact that a party has its residence in a foreign state, without more, "is insufficient to support the choice of a state's law." *Id*. at 287. Accordingly, even if MCR 2.112(J) did not foreclose defendant's argument, defendant has failed to show that Minnesota has an interest in the application of its law to this dispute that would be sufficient to overcome the presumption that Michigan law applies.

## III. ALTER EGO LIABILITY

Turning to the substance of defendant's claims of error on appeal, defendant first argues that the trial court erred in concluding that MHM's corporate veil should be pierced in this case so that he could be held personally liable for MHM's liability to plaintiff. We disagree.

Following a bench trial, the trial court's findings of fact are reviewed by this Court for clear error and its conclusions of law are reviewed de novo. *Midwest Valve & Fitting Co v Detroit*, 347 Mich App 237, 250; 14 NW3d 826 (2023). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *Id*. (quotation marks and citation omitted). "This Court also reviews de novo a trial court's decision on whether to pierce a corporate veil because piercing a corporate veil is an equitable remedy." *Florence Cement Co v Vettraino*, 292 Mich App 461, 468; 807 NW2d 917 (2011).

In Michigan, the legal principles regarding piercing the corporate veil apply to limited-liability companies. *Florence Cement Co*, 292 Mich App at 468-469. "Michigan law respects the corporate form, and our courts will usually recognize and enforce separate corporate entities." *Gallagher v Persha*, 315 Mich App 647, 653; 891 NW2d 505 (2016). "But 'usually' means not *always*, and when the requisite evidence establishes that the corporate form has been abused, the corporate form will be pierced so that creditors (and sometimes others) can seek payment of a corporate debt . . . from a responsible corporate shareholder." *Id*. at 654 (cleaned up).

-3-

"The traditional basis for piercing the corporate veil has been to protect a corporation's creditors . . . where the stockholders have used the corporate structure in an attempt to avoid legal obligations." *Rymal v Baergen*, 262 Mich App 274, 293; 686 NW2d 241 (2004) (citation and quotation marks omitted); see also *Gallagher*, 315 Mich App at 654 (explaining that "piercing the veil of a corporate entity is an equitable remedy sparingly invoked to cure certain injustices that would otherwise go unredressed in situations where the corporate entity has been used to avoid legal obligations") (cleaned up). This includes instances when an individual shareholder or officer of the corporation has "so misused the corporation that it was unable to pay on [an] outstanding judgment and an injustice would occur if the corporate form was not ignored." *Gallagher*, 315 Mich App at 664. That said, simply "establishing an entity for the purpose of avoiding personal responsibility is not by itself a wrong that would warrant disregarding the entity's separate existence." *Green v Ziegelman*, 310 Mich App 436, 459; 873 NW2d 794 (2015).

"[T]here is no mechanical test for determining when the existence of a separate entity must be disregarded and . . . whether to disregard the separate existence of an entity depends on the totality of circumstances." *Id.* at 457. See also *Glenn v TPI Petroleum, Inc*, 305 Mich App 698, 716; 854 NW2d 509 (2014) (listing various "[f]actors used by courts to determine the propriety of piercing the corporate veil"). As a general matter, however, "[i]n order for a court to order a corporate veil to be pierced, the corporate entity (1) must be a mere instrumentality of another individual or entity, (2) must have been used to commit a wrong or fraud, and (3) there must have been an unjust injury or loss to the plaintiff." *Florence Cement Co*, 292 Mich App at 469.

Applying these principles to the record in this case, we find no reversible error in the trial court's conclusion that MHM's corporate veil should be pierced. First, as to defendant's use of MHM as a mere instrumentality, the court did not err in concluding that defendant "blurred the lines between himself and MHM" and failed to treat MHM "as an entity separate from himself." See, e.g., *id.* at 470 (explaining that "[s]uch a failure is a hallmark of a claim for piercing the corporate veil" and "[e]ssentially, where members do not treat an artificial entity as separate from themselves, neither will this Court"). As the trial court recognized, defendant acknowledged at trial that he personally borrowed money from The Friedman Group to capitalize MHM; according to defendant, he took out the loan personally, rather than having MHM do so, to avoid having it reflected as a liability of MHM's. MHM then repaid the loan directly to The Friedman Group (rather than to defendant) through a $193,000 payment in 2018. See *id.* (finding support for piercing the corporate veil where the LLC's members "made no distinction between their own debts and [the LLC's] debts"). Defendant also acknowledged that, as of 2019, MHM owed American Express $270,000, and that MHM continued to pay American Express over other creditors in light of defendant's potential personal liability for that debt. And defendant does not dispute that he had MHM write him a check for $50,000 in December 2019, when MHM was admittedly insolvent. Defendant testified that this payment was to reimburse him for money he had previously contributed toward MHM's legal fees in unrelated litigation; when MHM received a favorable settlement in that litigation, defendant decided to make the payment to himself "so [he] could feel like [he] won a little at least" amidst the losses he had otherwise been suffering at the time. As discussed *infra*, that payment was impermissible under the UVTA.

Defendant stresses that plaintiff points only to matters that occurred when he was winding down MHM's affairs, none of which impugns how he interacted with MHM during the number of years prior that it was operating. We do not find that focus, however, to meaningfully undermine

plaintiff's bid for equitable relief in this case, which centers around the conduct and circumstances that ultimately left MHM in breach of its lease and plaintiff without meaningful recourse against MHM for that breach. See *Green*, 310 Mich App at 458 ("[W]hen considering whether to disregard the separate existence of an artificial entity, a court must first examine the totality of the evidence surrounding the owner's use of an artificial entity and, *in particular, the manner in which the entity was employed in the matter at issue*.") (emphasis added). And we agree with the trial court that, on the record before it, such conduct and circumstances were sufficient to demonstrate in this case that defendant treated MHM "as a mere instrumentality for [himself] as [an] individual[]." *Florence Cement Co*, 292 Mich App at 469.

The record likewise supported the trial court's conclusion that defendant used his control over MHM in a manner that wronged plaintiff. "In considering this element, it is not necessary to prove that the owner caused the entity to directly harm the complainant; it is sufficient that the owner exercised his or her control over the entity in such a manner as to wrong the complainant." *Green*, 310 Mich App at 458. Here, after entering into the three-year lease with MHM in April 2018, MHM began the process of selling its assets to NAF in the fall of 2018. The sale closed within a few months, and plaintiff only learned of it when subsequently trying to contact MHM about overdue rent—at which point MHM informed plaintiff that the lease, and MHM's liability under it, had not been assumed as part of the sale and that MHM was no longer in operation and had no revenue. And while plaintiff then went unpaid for what MHM owed it, defendant used MHM's assets to write himself a check for $50,000 and to pay off $270,000 in credit card debt for which he would otherwise be personally liable.

Finally, the record also supported the trial court's conclusion that plaintiff suffered an unjust loss as a result of defendant's actions with respect to MHM, which prioritized use of MHM's assets to compensate himself and limit his personal liabilities while leaving MHM in breach of its lease with plaintiff and plaintiff unable to recover from MHM for that breach. And as defendant himself maintains, there was no reason to anticipate such circumstances would come to pass at the time plaintiff entered into its lease with MHM. Cf. *Green*, 310 Mich App at 459 (explaining that "a loss is not unjust if the complainant had full knowledge of the circumstances surrounding the owner's use of the entity and agreed to proceed despite that knowledge").

In sum, we see no grounds to disrupt the trial court's conclusion that MHM's corporate veil should be pierced so as to hold defendant personally liable for plaintiff's losses arising from MHM's breach of the lease agreement.

## IV. VOIDABLE TRANSFER

Defendant next argues that the trial court erred in its conclusion that the $50,000 payment from MHM to defendant in December 2019 was a transfer that was voidable as to plaintiff, an existing creditor. We disagree.

As noted, we review a trial court's findings of fact following a bench trial for clear error and its conclusions of law de novo. See *Midwest Valve & Fitting Co*, 347 Mich App at 250. We also review de novo questions of statutory interpretation. See *O'Neal v St John Hosp & Med Ctr*, 487 Mich 485, 493; 791 NW2d 853 (2010).

The UVTA provides that certain transfers or obligations are voidable as to existing creditors. Specifically, MCL 566.35 states, in pertinent part:

(1) A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

MCL 566.31(s) defines "transfer" as follows:

"Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset. Transfer includes payment of money, release, lease, license, and creation of a lien or other encumbrance.

And as to the concept of "reasonably equivalent value in exchange for the transfer or obligation," MCL 566.33 provides, in relevant part:

(1) Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied. Value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

(2) For the purposes of [MCL 566.34(1)(b)] and [MCL 566.35], a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.

In seeking relief under MCL 566.35(1), a creditor bears "the burden of proving the elements of the claim for relief by a preponderance of the evidence." MCL 566.35(3). If the creditor carries that burden, it may obtain as relief, among other things, the "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." MCL 566.37(1)(a).

We find no reversible error in the trial court's conclusion that the $50,000 payment in this case was a voidable transfer under MCL 566.35(1). There is no dispute that the payment, which occurred in December 2019, was made when MHM was insolvent. And MCL 566.31(s) makes clear that a "[t]ransfer includes payment of money." Here, the trial court found that the $50,000 payment was a distribution to defendant in return for a prior capital contribution defendant had made to MHM—and defendant does not dispute on appeal that the payment constituted a return

of a capital contribution.[5]  As defendant acknowledges, that payment of money constituted a transfer as defined by the UVTA.

Defendant contends, however, that the $50,000 payment was not a *voidable* transfer under MCL 566.35(1) because MHM did, in fact, receive "a reasonably equivalent value in exchange for the transfer." According to defendant, the payment, which was made in December 2019, "was merely a way to equalize the $50,000 he had paid months earlier" to MHM through a capital contribution to cover MHM's legal fees in an unrelated matter. In support, defendant relies on cases that recite the general concept of an exchange of equivalent value—that what comes out must be reasonably equivalent to what goes in, and that "[a]s long as the unsecured creditors are no worse off because the debtor . . . has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred." *Harman v First Am Bank of Md*, 956 F2d 479, 484 (CA 4, 1992). None of defendant's cited authority, however, addresses circumstances similar to those here, nor does defendant explain how MHM's "unsecured creditors," like plaintiff, would have been left "no worse off" by the $50,000 payment simply because it did not exceed the amount in capital contributions that defendant had previously made. *Id.* When the $50,000 payment was later made to defendant in December 2019, no "property [was] transferred" to MHM "in exchange" at that time, nor was any "antecedent debt . . . secured or satisfied."[6]  MCL 566.33(1). Instead, as the trial court found, the payment was simply a check that defendant had MHM write him after it had become insolvent, compensating defendant for a prior contribution he had made "so [he] could feel like [he] won a little at least" without providing anything to MHM in exchange for doing so. Defendant has not identified, and we have not found, any authority demonstrating that the trial court erred in deeming such a transfer voidable under the UVTA. Cf., e.g., *Matter of Oakland Physicians Med Ctr, LLC*, 596 BR 587, 618-624 (Bankr ED Mich, 2019) (determining that certain advances were capital contributions rather than loans and thus the debtor did not receive "reasonably equivalent value" through their mere repayment). Accordingly, we reject defendant's claim of error to that effect.

---

[5] Below, the parties disputed whether the payment was such a return, or was instead a repayment of a loan that defendant had previously made to MHM. The trial court rejected defendant's loan-repayment characterization, and defendant does not challenge that determination on appeal. Defendant, however, does criticize the trial court's use of the term "distribution" when describing the $50,000 payment because, according to defendant, a "distribution" specifically refers to transfers that are made for the benefit of members with respect to their membership interests and defendant "did not receive any payment on account of his membership interest." It is not apparent from the trial court's findings, however, that the court was using the term in a strictly technical sense, rather than simply to communicate that MHM had distributed money to defendant as a return of his prior capital contribution. Nor does defendant suggest that this distinction might bear on whether the payment constituted a "transfer" as defined by the UVTA.

[6] As noted, the trial court rejected defendant's attempt to characterize the $50,000 as a repayment of a prior loan, and defendant does not dispute that determination on appeal. Nor has defendant attempted to argue that MCL 566.33(2)'s provision regarding "reasonably equivalent value" may somehow provide any support for his position.

## V. ATTORNEY FEES

As his final claim of error, defendant argues the trial court erred by awarding plaintiff its requested attorney fees. We disagree.

The trial court's attorney-fee award is reviewed for an abuse of discretion. *Pirgu v United Servs Auto Ass'n*, 499 Mich 269, 274; 884 NW2d 257 (2016). An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes. *Id*. Any findings of fact on which the court based its award are reviewed for clear error, and questions of law are reviewed de novo. *Reed v Reed*, 265 Mich App 131, 164; 693 NW2d 825 (2005); *US Fidelity & Guaranty Co v Citizens Ins Co*, 241 Mich App 83, 85; 613 NW2d 740 (2000). Whether a court was authorized to award attorney fees in the first instance is a legal question reviewed de novo. *In re Capuzzi Estate*, 470 Mich 399, 402; 684 NW2d 677 (2004).

Defendant first argues that the trial court lacked authority to award plaintiff attorney fees. In general, a prevailing party may not recover attorney fees as an element of costs and damages "unless expressly allowed by statute, court rule, common-law exception, or contract." *Reed*, 265 Mich App at 164. Here, the trial court awarded plaintiff attorney fees under a provision of the lease agreement between plaintiff and MHM. The trial court held that, because it had pierced the corporate veil between MHM and defendant, plaintiff's "*alter ego* claim [fell] within the fee shifting provision of the Lease," and defendant was correspondingly responsible for the attorney-fee award. The applicable provision of the lease provided that MHM would be held liable for reasonable attorney fees in the event MHM defaulted on its obligations to make rental payments. This provision stated, in pertinent part:

> Tenant will pay, in addition to the rentals and other sums agreed to be paid hereunder, reasonable attorneys' fees, costs and expenses in any suit or action instituted by or involving Landlord *to enforce the provisions of, or the collection of the rentals due Landlord under this Lease*[.] [Emphasis added.]

As discussed, plaintiff secured a default judgment against MHM for its breach of the lease, which awarded plaintiff "$52,548.24, plus interest, costs, and attorney fees from the date of th[e] judgment going forward." Plaintiff tried but was unable to collect that judgment from MHM, requiring plaintiff to then file the instant lawsuit in an attempt to recover from defendant directly. We see no error in the trial court's conclusion that this lawsuit, which plaintiff was forced to undertake to collect what it was owed under the lease, constituted "any suit or action instituted by or involving [plaintiff] to enforce the provisions of, or the collection of the rentals due [plaintiff] under th[e] Lease," and thus plaintiff was entitled to claim reasonable attorney fees for it.

Resisting this conclusion, defendant argues, as he did below, that plaintiff could not recover anything beyond the amount specifically awarded in the judgment against MHM without first seeking to amend that judgment, which plaintiff never did. Like the trial court, however, we fail to see why this might be so in light of the plain language of the lease as well as of the judgment itself, which expressly awarded plaintiff "attorney fees from the date of th[e] judgment going forward." Plaintiff also argues, as he did below, that the UVTA does not itself authorize the award of attorney fees. But even if we take that to be true, we agree with the trial court that it would not

undermine the propriety of the fee award here given the plain language of the lease, which provided its own, adequate basis for the award.

Lastly, defendant argues that the trial court failed to duly evaluate the reasonableness of plaintiff's fee request, pointing to the framework and factors set forth in *Pirgu* and *Smith v Khouri*, 481 Mich 519, 528-530; 751 NW2d 472 (2008). The record, however, reflects that the trial court did not err in this regard. As noted, the court, in its written judgment, specified a process for adjudicating the amount of the fee award: first, plaintiff was to finish submitting invoices for any fees it planned to request; then, defendant would have the opportunity "to object to the reasonableness of any attorney fees"; and then, if defendant so objected, plaintiff would have to file "a motion for settlement of attorney fees . . . along with [defendant's] objections," which the court would ultimately decide (after holding a hearing if the court deemed one necessary). The parties and court abided by this process, with plaintiff submitting its requested fees and defendant filing objections to their reasonableness. Defendant's objections tracked the arguments set forth above—that plaintiff's fee request did not fall within the terms of the lease and that plaintiff could not recover on its request without amending the prior judgment against MHM. In its ensuing order regarding the fee award, the trial court explained why those objections were unavailing and, as discussed, we do not see any reversible error in the court's conclusions to that effect.

On appeal, defendant criticizes the trial court for not doing more, contending that plaintiff "proved only that [it] paid the bills and that the hourly rates were fair, but did not prove that the volume of hours were reasonable." The court, however, duly addressed the objections defendant chose to raise regarding the reasonableness of plaintiff's fee request; if defendant is now suggesting he had additional objections or arguments, he had full opportunity to put them before the court at that time. Defendant failed to do so,[7] and we see no grounds to assign error to the trial court for that failure or to overlook it on appeal. See, e.g., *Baxter v Geurink*, 493 Mich 924 (2013) ("Because the plaintiffs did not challenge the hourly rate or the amount of time expended before the trial court, the issue regarding actual costs was not preserved for appellate review."); *Milligan v Milligan*, 197 Mich App 665, 671; 496 NW2d 394 (1992) ("Because the plaintiffs did not challenge the hourly rate or the amount of time expended before the trial court, the issue regarding actual costs was not preserved for appellate review.").

---

[7] Defendant posits that he did raise a broader set of arguments and objections below, pointing to a portion of his post-trial proposed findings of fact and conclusions of law. This filing, however, well pre-dated the court's judgment that expressly set forth the process for adjudicating plaintiff's fee request—which included affording defendant the opportunity to raise whatever objections he may have "to the reasonableness of any attorney fees." As discussed, the trial court then duly considered the objections defendant chose to raise pursuant to that process; to the extent defendant's earlier filing indicated additional arguments or objections, defendant waived them for purposes of appellate review by opting not to pursue them any further through the court's ordered process. See, e.g., *Lewis v LeGrow*, 258 Mich App 175, 210; 670 NW2d 675 (2003) (explaining that reversible error may not be predicated "upon alleged error to which the aggrieved party contributed by plan or negligence").

Affirmed.

/s/ Sima G. Patel
/s/ Brock A. Swartzle
/s/ Philip P. Mariani